Invenergy Thermal LLC v. Watson Good morning, and may it please the Court. Michael Mestitz for Appellants Invenergy and Grays Harbor Energy. I'd like to reserve five minutes of my time for rebuttal, and I'll keep my eye on the clock. Before we discuss the issue of discrimination under the Dormant Commerce Clause, I want to address the two clearest bases for reversal here. First is the District Court's sua sponte dismissal with prejudice for lack of jurisdiction. Ecology does not defend that on appeal, and the Court should vacate that portion of the claim. As Ecology concedes on page 41 of its brief, Pork Producers allows even nondiscriminatory burdens to go forward. Ecology only argues here that we inadequately alleged any burden. We disagree, but at best, dismissal should have been without prejudice to allow us to replead. Now, third and finally, the District Court also erred in holding that there was no discrimination under the Dormant Commerce Clause or the Equal Protection Clause because it did not believe that we were discriminating against the district and that we were similarly situated to utilities. But in the competitive market for power generation, Invenergy is similarly situated to the utilities because they both own generating facilities, and Grays Harbor is similarly situated to the utilities' plants because they generate electricity to sell either to utilities or on the wholesale market. And Ecology concedes at page 30 that Grays Harbor competes with the utility-owned plants in this respect, which establishes that they are similarly situated under the law. But Invenergy and Grays Harbor are treated differently from utilities and utility-owned plants because utilities get no-cost allowances to reduce their plants' compliance burden under the CCA. Invenergy does not. And utilities receive these no-cost allowances based on their status as utilities or their special connection to the Washington market. Next Era dealt with a very, very similar circumstance and remanded both pike and discrimination claims after the district court dismissed. So we submit the same outcome as appropriate here. So if the state had a scheme where every gas or oil power plant in the state has to buy credits or pay a tax, I mean, they're economically equivalent, whether it's utility-owned or owned by an independent party, I take it you would not be here. You wouldn't have any claim challenging. And that's all the statute is. It just applies to every emitter in the state that has to get a permit. Yeah. So I think that's a really key distinction. And I think that's what we see in the case law that talks about sort of across-the-market cost increases, but where there's no sort of disparate effect on different market actors. And you're right here. The core of the issue is that similarly situated entities are being treated differently. Okay. Well, so then, so the answer to that is, you know, that would be fine. Suppose the state, you know, different state program, they decide, you know, we want to make it cheaper for Washingtonians to buy electricity. So we're just going to write a check to every utility, you know, so many cents a kilowatt hour for, you know, based on what your customers are using. We're just subsidizing utilities. I take it you don't have any objection to that. They're allowed to do that? So I think that is closer to the line, and this is the Tracy line, which is you have to understand, and this is what Tracy in NextEra does, you have to understand whether the law is primarily regulating the captured utility market or whether it is regulating this adjacent competitive market. Now, under your hypothetical, I don't think we have a circumstance where the adjacent competitive market is being distorted. And you see this, I think, in some of the parties' discussions about CETA versus the Act, right? So CETA is a law that governs, you know, how utilities are going to have to buy power between now and 2045, right? That regulates the utility market. And so it falls directly on them. And if it affects the generation market, it's just affecting the utilities as buyers from the generation market. But it's not distorting the generation market. It's not treating different actors in the generation market differently. Now, the Act is really importantly different. Because what the Act does is it requires entities that generate CO2 to purchase allowances. Utilities in their capacities, utilities don't really generate CO2. That's what happens in the power generation market. And so although utilities are assigned these allowances, the compliance burden of the Act is felt in the generation market. You know, the entities that are generating have to buy allowances unless they are able to get them from some place. And here, the utilities can just downstream the allowances to their own power plants. So that's why you have a real distinction in the way that similarly situated power generators are being treated. Well, so then, I mean, I guess my next question is then, isn't the actual scheme that Washington has economically equivalent to my first two hypotheticals combined? So I don't think so. And I don't know that I... Why not? So, and this is because, again, the purpose of these allowances is to be sent into the power generation market, right? And so you have certain power plants that we allege. And again, remember, this is an effects-based claim. It's not a facial claim. So you have to look at the effects this is actually having. What we've alleged in our complaint is that as a practical matter, the utilities are going to send these to their own plants instead of the sole independent power producer in Washington, which is in Venergy Graze Harbor. And so those utility-owned plants, by virtue of their affiliation with the utilities, get an enormous benefit in this competitive power generation market. It's particularly strongly felt here because a megawatt is a megawatt, right? This electricity is completely fungible. An electron is an electron. And so what distinguishes between products on the generation market is the cost of generation, right? And so utilities have gotten this benefit. They can pass on to their plants and make it very, very difficult for Graze Harbor or for anyone else who wants to enter the market to practically compete against them. In order to do that, you have to be a Washington utility. This is exactly what NextEra looked at, right? NextEra, a law in Texas, said, well, we think only utilities can build power transmission lines. And the Court there did a very thorough analysis of Tracy and the relevant Dormant Commerce Clause, and it said, look, we recognize that there is this special utility market. It's a captured market. But the Supreme Court in Tracy made very clear there's no Dormant Commerce Clause exception for utilities. What the Court did is what we have to do is we have to look at where is the burden of this law being felt? Is it being felt in the utility market, or is it being felt in a separate competitive market? And they said there, look, the market for building power lines is a separate competitive market. And that's what we have here as well. Now, if your plant were located in Idaho, you would not be subject to this scheme, right? That's correct. I think there would still be a burden on interstate commerce, but we wouldn't. If you were located in Idaho, you could admit to your heart's content without regulation by Washington, and you could sell power into Washington, couldn't you? On the interstate grid, yes. So it's a curious sort of Dormant Commerce Clause discrimination claim that says, well, we're being disadvantaged because we're located in the state that's imposing the regulation, whereas if we did exactly the same thing out of state, we would, I mean, it seems like they're discriminating against the local interest rather than in favor of it. So I don't think so, and I guess I have two reactions. The first is that, of course, again, pike exists regardless of discrimination. But I do want to get to the in-state, out-of-state distinction because I think that's something that has taken up a lot of air and ink in this case. And again, NextEra, I think, makes clear that what you're looking at is not a talismanic, in-state, out-of-state line based off organization, but you're asking whether or not there's a set of market incumbents that are getting a special benefit based off their connection to the local economy. And here, as in NextEra, it was the utilities, right? And I can give you some cases that prove this. This Court's Yakima case makes the point that, at page 933, the Commerce Clause protects the vitality of the national market for goods and services, not the locations of a particular participant. I already mentioned NextEra. Florida Transportation Services case out of the 11th Circuit at page 1259, excuse me, says, look, the place of incorporation is not determinative. If that were the case, and this is a quote, then a state or municipality's dormant Commerce Clause liability would turn on the empty formality of where a company's articles of incorporation were filed, rather than where the company's business takes place or where its political influence lies. And so I acknowledge that, you know, while we talk about sort of in-state, out-of-state, I do think it's a subtler distinction. And the purpose is to look at, well, look, is there a set of entities that are being distinctly advantaged based off some sort of connection to the forum? Here, that's the utilities, just as it was in NextEra. And then are there other entities, in-state, out-of-state? I mean, in this case, you're making it practically impossible for anyone to start a new generating facility in Washington, which is an out-of-state effect, right? That's the protectionist discrimination. But is there a particular class of incumbents that are being strongly advantaged in this purely competitive market? That's the generation market here. I mean, obviously, the district court, I think, was very concerned with sort of the Pacific Core question. It was concerned with these Washington, you know, university entities that are pleaded nowhere in the complaint and so are just entirely inappropriate to take into account at the pleading stage. If you look at the First Circuit Walgreens case, it sort of makes the point that we're conducting an effects-based test here. And so we need to look at the reality of what is happening in the market. And it may be that the line is not perfectly sort of in-state, out-of-state. There might be some in-state actors that are burdened. There might be some out-of-state actors that are incidentally benefited. But do you have this core protectionist concern? So, can I just – you said, you know, the scheme makes it hard or impossible for somebody to come in and – an independent person to come in and build a power plant in Washington. When we consider both statutes together, it's also hard for a – if Puget Sound Energy wants to build a new natural gas plant, like, they're going to be burdened by the scheme too, aren't they? Well, so again, I think you have this question about are they being disparately affected, right? So I understand it may not be, you know, for reasons of CETA or wherever else, something that you're going to have a bunch of people starting to build natural gas power plants. But there is going to remain ongoing demand. I mean, Invenergy is a green energy company. And one of the things that's very important to Invenergy is operating an efficient and clean plant in this bridge period where we move to more renewable sources. So there is a need there. I mean, I think the issue and why there's this protectionist effect is that any plant affiliated with the utilities is going to be able to allay its compliance burden with the CCA, whereas Invenergy or anyone else who wants a plant but is not affiliated with these incumbent utilities is going to have to pay significantly more. And because you have this highly competitive, price-sensitive market for power generation, it just makes it impossible. And so, again, you know, in the Dormant Commerce Clause, whether it's PIKE claims or whether it's a discrimination claim, you know, you see this both. One of these prototypical burdens on interstate commerce is this type of protectionist effect. We allege it here at ER 60 through 64, where you're seeing, again, it is a licensing regime or it is a tariff or a cost increase of some sort or, you know, a certificate of need requirement, something that makes it harder for the free flow of interstate commerce to reach into a state and for any comers to compete on even ground with the incumbents. And respectfully, we suggest that's what we've got here. And you've mentioned Tracy a couple times, but just take me through again how you distinguish Tracy. Sure. So Tracy, I think, sets out the rule, again, that when you have a utility, there's not sort of per se Dormant Commerce Clause carte blanche that the government gets. But you have to actually look at what's the core market that's being regulated. Now, in Tracy, the Court looked at that, and it was a bundled gas product. And it said, you know, in essence, it reached the opposite conclusion. But it looked at these two markets, and it said, well, okay, this is really covering the captured utility market because it is dealing with the end delivery of that natural gas to consumers. And so they said, look, this is dealing with the captured market. There's a competitive market. But the act there deals with the captured market. Next there, I think, is the opposite circumstance, right? It sits down, and it says, look, Texas has said only utilities can build power lines. We are going to look at this, and we're going to say, does this primarily regulate the captured market, or does this primarily regulate a competitive market, the market for building power lines? And there, the Court said, look, you've got this separate market for building power lines. The plaintiff there was a power line company, but not a utility. And it was seriously disadvantaged because the utilities got this benefit. All of a sudden, only they could build it. Now, it's certainly the case, right, that power lines have something to do with the end distribution of electricity to rate payers, right? They're part of the power grid. That's also why you have an interstate effect. Arkansas Electric makes clear that the interstate power grid is an interstate commerce instrumentality. But the Court there said, look, I mean, I know we're dealing with power, but we've got to look really carefully at these two markets. And what Texas has done is it has advantaged utilities in this competitive market and, therefore, given them an unfair advantage, right? And the Court made the point, if that were the rule, you could give utilities all sorts of special treatment, including giving them, the Court says, exclusive right to sell ice cream in the State of Texas. That would have — But here, the thing that the utility is getting, the special benefit that it gets that you don't, is, as I understand it, an allowance that's tied to, like, its customer base, right? It's not you have a prerogative to do something in some other market that no one else can. It's, like, we're giving you a benefit for the local customers that you serve, based on the number of local customers that you're serving. So that seems much more tied to regulation of the local utility market, which the state can do, right? Well, so the number of allowances is assigned based off the ratepayer base. But that is basically the end of the utility market's involvement in these no-cost allowances. Because, again, they get applied into the competitive market. So I don't see it as substantially different from saying, well, look, utilities know what they're doing with power lines. Therefore, we should assign power line rights based off utility status. I mean, I understand where you're coming from, Your Honor. I just think it's different, which is to say, yes, there is this fig leaf connection. But if you look at where the compliance burden of the Act falls, it falls on the generation market. It falls on people generating CO2. And so, practically speaking, what's going to happen is that these get downstreamed to the plants. Now, we haven't talked a lot about the dismissal with prejudice. Obviously, something that comes up a lot in our briefs is how we might amend to add allegations as to any of these issues you still have concerns about. I will say we filed our complaint prior to the enactment of the Act. The Act took effect January 1st, 2023. And so we now have two years of experience living under this law. And we've seen what it's done. We've seen how these things actually have or, rather, have not been transferred. We see the effect it's had on the market. We even see additional interstate effects, like the fact that the Act has increased the cost of electricity for people outside of the State of Washington. And so, again, to the extent you have concerns either about, you know, the burden, the pike balancing test, or whether or not we're similarly situated, all of those are things we could allege. And many of those are things that might raise questions of fact, that then you would do discovery on the market, on direct competition, and then would be resolved. I see I'm now at three minutes. I'll reserve the balance of my time. Thank you. Good morning. And may it please the Court, Kelly Wood on behalf of the State of Washington. As I think the Court is keyed in on, Washington has taken a two-prong approach to decarbonizing its energy sector. The Clean Energy Transformation Act, or CETA, requires Washington utilities to decarbonize their portfolios. And the Climate Commitment Act requires anyone generating wholesale power to account for their greenhouse gas emissions. Within this system, if energy exceeds in invalidating no-cost allowances, they'll be the only power plant in Washington not accountable for its greenhouse gases. This Court should reject that. The Supreme Court has warned on multiple occasions that to protect federalism, courts should exercise extreme caution before invalidating or invoking the Dormant Commerce Clause to be clear. There are no clear infractions here. Their discrimination claims all fall apart under scrutiny, and their invocation of Pike here seeks to vastly expand the scope of that doctrine right after both this Court and the Supreme Court have confirmed its limited scope. And I'd like to start with how CETA and the Climate Commitment Act function, because I think a lot of Envenergy's arguments here rely on an inaccurate picture of how the statutes work. Now, CETA was adopted in 2019. It applies only to utilities, and it requires that the power that they provide to Washington consumers, what we refer to as the retail power or the retail load, be carbon-free by 2045. What that means is that utilities are going to have to spend a lot of resources to bring those renewable sources online because they simply don't exist now, and we do anticipate that that will result in an increase to consumer energy costs. The Climate Commitment Act was adopted a couple of years later. It's broader. It applies to any significant source of greenhouse emissions in the state, and it requires them to purchase allowances to account for those emissions, and we expect that that will increase the cost for any carbon-intensive activity in Washington. But critical here, without no-cost allowances, these statutes are duplicative on the utilities because either statute on its own would decarbonize retail power. CETA, by decreasing the percentage of carbon sources that utilities are allowed to have in their portfolios to serve Washington consumers, and the Climate Commitment Act by slowly decreasing the amount of allowances that are available to cover those emissions. So the Climate Commitment Act gives allowances to the utilities to exempt what CETA already covers, providing retail to Washington consumers, and Invenergy's argument that those can be used to cover all of their power generation is just incorrect. Just like Invenergy, when the utilities are operating on the wholesale market, so when they're selling their excess power on the wholesale market in competition with entities like Invenergy, they do not receive no-cost allowances for that. That is on the face of the statute at RCW 70-A-65-120. So to make a simple analogy here, a simple explanation, if a utility generates 50 allowances worth of power and provides that to their retail customers, and they generate 100 allowances worth and sell that on the wholesale market, they still only get 50 allowances. They have to go out and purchase, just like Invenergy, the rest of those allowances on the open market. And for the 50 that they do get, they can't be used to either increase utility profits or undercut wholesale sellers like Invenergy, because by statute, they must be used to the benefit of the ratepayers. They've got to be used to reduce energy costs. This approach fully complies with both the Dormant Clause and Equal Protection, and we provide a host of reasons why. But I'd like to start with the threshold question of similarly situated, because that is a brick wall that all of Invenergy's claims slam into, and Your Honor is keyed in on the General Motors v. Tracy case. That is a binding precedent on this Court that compels a finding that Invenergy is not similarly situated to the utilities in this case. And the facts in Tracy are strikingly similar to what we have here. It involved an Ohio tax break to in-state utilities, natural gas utilities, that was not provided to the wholesale sellers that, you know, served large volumes of natural gas to large clients like General Motors. And the Court upheld that because it found that the utilities and the wholesalers were not similarly situated because they provided different products in separate markets. The utilities provided a bundled product in the noncompetitive captive consumer retail market for natural gas, while the wholesalers sold an unbundled product in the wholesale market to large entities like General Motors. Just like the natural gas utilities in Tracy, Washington's utilities provide a bundled noncompetitive market, noncompetitive product on the retail market, and just like the wholesalers in Tracy, Invenergy provides an unbundled competitive product on the wholesale market. Because you have separate markets and separate products, Invenergy is not similarly situated to the utilities here. And this sort of trying to draw a distinction based on the fact that both utilities and Invenergy are dealing in electrons, that didn't make a difference in Tracy. Both the retail groups or retail utilities in Tracy and the wholesalers were dealing in the molecules of natural gas. But the product, again, is this unbundled versus bundled product. And there are compelling reasons to treat those separately. And Tracy talked about this. It's a health and safety issue where state power is typically at its highest ebb because when it comes to that captive monopoly market that the utilities operate in, consumers have very little power in that market. You and I have no choice as to where we purchase our power. We purchase in such small quantities that we don't have any bargaining power with regard to the price. It's why it's so highly regulated. It's why the utilities don't get to set their own rates. They have to get that through organizations like the UTC, Washington's UTC. But I think part of their argument, at least, is that you have the incumbent utility, right? And it's got 5,000 megawatts worth of customers and then 5,000 megawatts worth of generation and it sells to its customers. And the state gives it allowances for those customers that cover its generation. And somebody else wants to come along and compete in what is a competitive wholesale market by building a new power plant. And the effect of your scheme, as they describe it, is to disadvantage them because the utility already has allowances that cover the generation it has. And somebody else who wants to maybe have cheaper generation to undercut them is disadvantaged because they don't get the allowances. So isn't that a sort of discrimination against new entrants in the wholesale market? No, Your Honor, it's not. And for a couple of reasons. I mean, I think, first of all, let's take it true that this proposition, we're on a motion to dismiss. So let's take as true that allowances encourage utilities to use their own power plants and not buy from people like Intervenergy. Because they're not substantially situated, the Commerce Clause allows that. The Commerce Clause allows states to draw distinctions between parties that are not similarly situated. So absolutely, the state could do that. It could do it in an even stronger way than it's done so here. And secondly, this is the Exxon case where the state of Maryland was disincentivizing vertically integrated refineries in favor of non-vertically integrated situations. The Commerce Clause does not protect any particular means or mechanism of commerce. It doesn't protect any particular actors. It protects the market itself. And so, you know, the state can sort of put weight on the scale of any particular mode or mechanism of conducting business. So I think that's the way to differentiate that situation. And really, there is no way to get around Tracy here. It really is stunningly on all four with this case. And in fact, we'd argue it's even stronger. In Tracy, you know, the court had to weigh, and my colleague talked about this, you know, which market to give significance to. Well, Tracy addressed that. In Tracy, the utilities got the tax cut both when they were operating on the retail markets selling to their consumers, but they also got it when they were in direct competition with the wholesale suppliers. And so the court was sort of weighing which one do we give more weight to. Here, we don't have that. When utilities are selling on the wholesale market, they don't get no cost allowances. So they're treated exactly like Invenergy. They have to go out and buy those. And so here, where you have — where Invenergy concedes the wholesale market's the only place that they're in competition with utilities, where those utilities are treated exactly the same, that just destroys any argument that the utilities are somehow advantaged here. And what about NextEra? NextEra was an in-state presence case, and I think it's distinguishable on multiple grounds. But, you know, what the Fifth Circuit was most concerned about in NextEra was the fact that it provided an absolute barrier to anyone to enter what is a competitive market, you know, building transmission lines that didn't have a physical presence in the case. And there's sort of a long line of physical presence cases where the courts have sort of shut that down. We don't have that situation here. There's no dispute that the Climate Commitment Act doesn't prevent any barrier from in-state participation in the market. As we point out, it wouldn't prevent a Texas company from coming in and purchasing Puget Sound Energy next week. It wouldn't protect Invenergy from petitioning the UTC to create its own utility. Now, what they come back and say is it'd be difficult to do that, and we don't disagree that it's difficult to create a utility in Washington or to purchase a utility. But the key aspect here in terms of differentiating NextEra is that it would be just as difficult for an in-state interest to do that as an out-of-state one, and none of that difficulty would be because of the Climate Commitment Act. Now, we give a lot of other reasons why the court can find there's no discrimination here. We talk about different ways that they're not similarly situated, including the regulatory systems they operate in, the fact that CETA applies to utilities. We talk about the fact that there's no evidence of economic protectionism. Unless the court has specific questions on that, those pieces, I'd like to turn to their Pike claim, because I think the lack of discrimination here also illustrates why their Pike claim fails. And there are two takeaways from both this Court's and the Supreme Court's decisions in National Pork that really inform the deficiencies in their Pike claim. And that starts with the Supreme Court's decision, recognizing that it was fractured on many fronts. But there were some important things that a majority of the Court did agree on, and that was that Pike has a very narrow focus. As Justice Gorsuch explained in his opinion, that discrimination remains at Pike's heartland, at its core. It functions really just to root out hidden discrimination. And that did beg the question of the Supreme Court's decision, and that's not all it is, right? You're certainly right. That's not all it is. And Justice Gorsuch's opinion, which did draw a majority on this front, answered the rest of that question, which is, what else does Pike do? And it looked to these line of cases that predated Pike to the large extent that talked about arteries and instrumentalities of commerce, things that require uniform regulation throughout the country. Like one of the examples was the truck mudflaps case, where if all 50 states had a different requirement for mudflaps and trucks had to stop at the borders and swap out mudflaps, you know, those types of regulations. So here, where you don't have discrimination because you don't have similarly situated parties, and we're not talking about the articles and instrumentalities of commerce here. We're not talking about things that impede the flow of goods between the states. This Court's decision in National Port and the Supreme Court's decision answer this question. There's nothing left for Pike to do. So the second key takeaway from that— your view is that after pork producers, all that is left of Pike is discrimination or arteries and channels of commerce, interference with the arteries and channels of commerce, and that's it? That's, as far as we could tell, those are the only cases that, as Justice Gorsuch's opinion explained in going into these line of cases, aside from rooting out hidden discrimination, that really is the only other context in which Pike has been applied. And so maybe there's a narrow sliver out there that exists somewhere, but we just haven't found it. But, I mean, because several of the justices, and I think here several is more than five, in Pike said that, you know, stated the more general proposition that when you have a burden that is out of proportion to the benefits of the law, that there can still be a Pike claim, didn't they? I think, yes, a majority of the Court held that Pike still exists, certainly. And they didn't say, you know, but only if it's about arteries and instrumentalities of commerce. I do think a majority of the Court held firm to the concept that Pike really is focused on discrimination. And once you get outside of that heartland, that you're really in a very extremely narrow lane where, as far as the Court could tell, the only time that that constitutes a claim is when you're dealing with these arteries or instrumentalities. So we have a very, very truncated discussion of Pike from the District Court here. And, you know, they've made the point that, you know, in the time that the law has been in effect, you know, there's learned more about exactly how it works and, you know, what the burdens are. Why shouldn't they get leave to amend to make whatever case they have under Pike now? For a few reasons, Your Honor. I think one that starts with there are no set of facts that they can allege here that differentiate this case from General Motors versus Tracy that shows that they're not similarly situated. So, you know, there's nothing that they can put in the record that says we're in Pike's heartland talking about discrimination because discrimination doesn't, just doesn't exist here. But another reason, I think, it goes to the other side of the Pike equation. Obviously, they have to show substantial burden on commerce. You know, we argue here that the other important part about national pork is it comes from this Court's decision that that bar is incredibly high, right? The facts taken as true in national pork at the Ninth Circuit were that California's proposition on animal welfare was going to completely upend the nationwide market for pork and cause extreme market distortion. So we just don't have that sort of substantial burden. But even if there was, for the sake of argument, if they could show substantial burden, they still run headlong into the other side of Pike, which is to show that there's no rational basis for the states to do what it's done here. And what this Court has said in this context is that is they have to show that the reasoning is illusory, that, you know, the facts underlying the statute can't reasonably be conceived to be true. And so that's a standard that they also can't meet, even if they show a substantial burden here. So what they argue on that side is that no-cost allowances are illusory because they increase emissions and increase energy costs. Let's take those one at a time. On emissions, no-cost allowances are not intended to decrease emissions. And, in fact, they exist solely to exempt those emissions from the Act completely. And so even if it's true and they could go back and have all sorts of facts about how no-cost allowances increase emissions, it's immaterial to this case because that's not what no-cost allowances are trying to accomplish. On energy costs, as we point out, the key word from the statute is mitigate. It does not say prevent a rise in consumer energy costs. So what that means in this context is that Invenergy has to find facts that show that a direct subsidy in as close to the amount as the state can get as possible to account for the costs that utilities have under the Climate Commitment Act will absolutely fail to move the needle at all on consumer energy costs. That's the illusory standard. And it is implausible speculation that this Court does not need to accept as true that they can go find facts that basically, you know, prove that negative or, as we put it in our briefing, that prove that 2 plus 2 equals 5. Now, they allege here and they allege in their reply brief that there have been cost increases in Washington for consumer energy. They don't provide any basis to support that. And to the state's knowledge, there haven't been significant increases in consumer energy costs, but even if there were, they would need to show that those increases in costs are exactly the same with or without no-cost allowances. That's the burden that they can't overcome here. So there are multiple reasons why remanding to the Court here would just simply be a waste of judicial resources because, as this Court knows, you know, it's not required when, you know, it would be sort of pointless to have that remand. Unless there are any other questions, we ask that the Court affirm dismissal. Thank you.  With my brief rebuttal time, I'd like to try and make five points in response to the argument of my friend on the other side. The first and maybe the most important point is that this is a pleading-stage case. And I think what we heard is a lot of discussion about how the law is or is not working in practice or how these no-cost allowances move through the market. Here on the pleadings, we have alleged how they are going to. We could certainly allege how they have if given opportunity to amend, but all of that needs to be taken as true. And I think to the extent there are questions about whether there is actual competition or even whether there is similar situation or how these things move, that is a fact question. And in National Association of Optometrists, that arose after summary judgment. This Court actually had to get discovery to figure out whether optometrists and ophthalmologists were similarly situated. And it used expert evidence. And ultimately then, at summary judgment, it decided the discrimination issue. My second point is pork producers, just briefly. I don't think that the majority, which again is only Section 4A there, limited it to articles and instrumentalities of interstate commerce. I think if you look at Chief Justice Roberts' opinion, which is joined by four justices, he discusses this issue. I will say I don't see why the interstate power grid is not an artery or instrumentality of interstate commerce. And indeed, the Supreme Court has held it is in the Arkansas electric case. Third is just being clear about what the markets that we're talking about here is. Because at one point, my friend said, we've conceded that only the wholesale market is at issue here. He also discussed this is the same as sort of the bundled product in Tracy. And that's not true. Because again, you've got power generation on one hand, which is the market we care about. That's the market we act in and are similarly situated to the other plants in. And then you've got the market for distribution. If you think about buying something online, you've got a market for the widget and people compete to manufacture the widget at the best possible price. And then you've got a market for mailing it. And we're talking about this. Now, there is nothing that requires utilities to buy power from their own plants. Right? That's why this is a competitive market. Because absent the distortion by the Act, they might buy the power that we dispatch for their plants to dispatch to rate payers. They might buy their own. It's going to depend on what's cheapest on any given day. And here, there is a huge, huge thumb on the scale that has distorted this market and that is allowing their plants to generate power significantly cheaper than us because they're affiliated with the utilities. My fourth point is just about NextEra and Exxon case. Exxon was a case, if you look at page 125, 126, there was no allegation of disparate treatment. Again, Exxon was an across-the-board price increase. And so that's fundamentally different from what we have here, where some people are advantaged, some people are disadvantaged. As to NextEra, he says this is a physical presence case or an absolute barrier case. The court viewed it as a physical presence case because of the utilities. If you look in there, that's what the court called the physical presence. And there's no rule that only an absolute barrier is subject to the Dormant Commerce Clause. On the contrary, West Lake Creamery, West Lynn Creamery, and Pike itself were both increasing costs of doing business. I see I've gone over my— If you want to— One last point, if you could very briefly— My last point is to the balancing of whether or not these benefits are illusory. He said rational relation. Pike is actually a little bit stricter than that on the government law. But these are prototypical balancing issues that have to be done based on facts. What we're challenging here is not the allocation of no-cost allowances. It is the disparate allocation. And we've alleged, and we can prove, that if we got no-cost allowances just like the utility-owned plants, emissions would be lower and prices would be lower.  Thank you. With that, we urge the court to vacate and remand. Thank both counsel for their arguments, and the case is submitted, and we are adjourned.
judges: THOMAS, MILLER, Molloy